**Doris Mae COLEMAN et al., Plaintiffs below, Appellants,**

**v.**

**George H. H. GARRISON and Wilmington Medical Center, Inc., a Corporation of the State of Delaware, Defendants below, Appellees.**

Supreme Court of Delaware.

Submitted July 2, 1975.

Decided Nov. 26, 1975.

Joseph S. Yucht, Balick & Yucht, Wilmington, for plaintiffs below, appellants.

Rodney M. Layton and Jane R. Roth, Richards, Layton & Finger, Wilmington, for defendant-appellee George H. H. Garrison.

Howard H. Handelman and William J. Alsentzer, Jr., Bayard, Brill & Handelman, Wilmington, for defendant-appellee Wilmington Medical Center, Inc.

Before DUFFY and McNEILLY, JJ., and BROWN, Vice Chancellor.

DUFFY, Justice:

In this malpractice action plaintiffs, husband and wife and their five children, seek damages alleging improper performance of a sterilization operation (a bilateral tubal ligation) on the wife, after which she became pregnant and delivered a sixth child. They appeal from a summary judgment entered for defendants (the surgeon and the hospital where the operation was performed) by the Superior Court. Del.Super., 327 A.2d 757 (1974).[1] While our analysis differs somewhat from that of the Trial Court, we reach the same result.

---

I. In prior proceedings the Superior Court had denied a motion by Wilmington Medical Center, Inc., to dismiss the complaint for failure to state a cause of action, 281 A.2d 616 (1971), and this Court affirmed. *Wilmington Medical Center, Inc. v. Coleman,* Del.Supr., 298 A.2d 320 (1972).

## I

We first consider plaintiffs' contention that the surgeon was negligent because he did not cut and remove a sufficient segment of the Fallopian tubes and that he failed to relocate them anatomically so as to avoid regeneration.

■ Our decision in *Hurtt v. Goleburn*, Del.Supr., 330 A.2d 134 (1974), is controlling on these contentions. In discussing Superior Court Rule 56(e) and the duties of parties when a motion for summary judgment is filed, we stated:

"Superior Court Civil Rule 56(e) provides for a shifting of burden to the non-moving party when a motion for summary judgment is '. . . supported as provided in . . . [the] rule . . . .'.

In the context of a negligence action 'supported' means that the moving party submitted proof that he had conformed to the requisite standard of care under the circumstances at issue. For present purposes that requires a showing, (a) as to the relevant medical standards adhered to by physicians in good standing in the community under like circumstances, and, (b) that defendant's conduct was in conformity with those standards. . . . If the conduct is shown to have conformed to the standards, then the burden shifts to plaintiff to demonstrate on the record that there is a genuine issue for trial as to either the standards or the conduct. Until then, the non-moving party is not obliged to show that issues remain to be tried. . . ."

■ Applied here, *Hurtt* means that if the surgeon's conduct with respect to cutting, removing and relocating the tubes is shown to have conformed to the relevant medical standards of the community, the

burden is shifted to the Colemans to demonstrate on the record that there is a genuine issue for trial as to either the standards or the surgeon's conduct.[2]

■ In support of their motion defendants filed an affidavit by Dr. William G. Slate, Director of the Department of Obstetrics and Gynecology at the Wilmington Medical Center, which states that:

"2. I have examined the true and correct reproduction of the Department of Pathology Report, Delaware Division Wilmington Medical Center, dated October 10, 1966, and attached hereto as Exhibit A. This report states that the two segments of a tubular structure, measuring 1.4 x 0.4 and 1 x 0.4 cm respectively, from patient Doris Coleman, were Fallopian tube segments.

3. Based upon my experience, it is my opinion that the removal of segments of Fallopian tubes from the patient of the dimensions indicated in the Pathology Report conforms to the proper standard of cutting and removal of portions of the Fallopian tubes in a bilateral salpingectomy practiced in Wilmington and similar communities.

4. Furthermore, where the technique of removal of segments of Fallopian tubes as described above is employed in a bilateral salpingectomy, it is not the accepted standard of good medical practice in Wilmington, Delaware, or similar communities to relocate the tubes anatomically."

Given this record showing of the surgical (medical) standard followed in the kind of operation here involved and defendant-surgeon's compliance with it, the burden shifted to plaintiffs to present competent medical evidence to rebut the assertions. They did not do so and, indeed, failed to

2. The settled rule in Delaware is that a surgeon is bound to the same standards of care and competence as other surgeons in good standing ordinarily adhere to in the community. *DiFilippo v. Preston*, Del.Supr., 173 A.2d 333 (1961); *Christian v. Wilmington General Hospital Association*, Del.Supr., 135 A.2d 727 (1957).

produce any such evidence as to either the standard of care or the way in which the operation was performed. It follows that as to these claims of negligence the judgment of the Superior Court must be affirmed. *Hurtt v. Goleburn,* supra.

## II

Next, plaintiffs contend that the surgeon entered into an oral contract with them promising that the operation would be 100% successful and that the wife would not become pregnant again. The doctor denied making such a promise.

■ In the absence of a special agreement a surgeon does not warrant or guarantee a good result by his patient or that he will effect a cure. 61 Am.Jur.2d *Physicians, Surgeons, etc.* §§ 148, 149; 70 C.J.S. *Physicians and Surgeons* § 47; 43 A.L.R. 3d *Annot.*: 1221. Stated otherwise, a surgeon is not an insurer of the success of his treatment. *Peters v. Gelb,* Del.Super., 303 A.2d 685 (1973), aff'd Del.Supr., 314 A.2d 901 (1974). It follows that, to be enforceable, a warranty or guarantee of success of an operation must be express and be supported by a separate consideration. *Gault v. Sideman,* 42 Ill.App.2d 96, 191 N.E.2d 436 (1963).

■ Here, the only consideration involved was the fee for the operation itself. Hence, assuming that the promise was made as plaintiffs contend, there was no consideration to support it and, therefore, it is not enforceable. Thus, plaintiffs may not recover on a warranty theory.

## III

We now consider plaintiffs' argument that the surgeon was obligated to explain to the wife the hazards of the operation, the chances for success or failure and any alternative procedure available to accomplish sterilization.[3] The surgeon argues that even if all the risks and alternatives had been explained, nevertheless, the Colemans would have chosen a bilateral tubal ligation and, therefore, any absence of informed consent was not a proximate cause of the claimed injury.[4]

It appears that the difference between the parties as to informed consent involves a material dispute of fact (but see 64 *Nw. U.L.Rev.* 638) raising a jury issue and, for present purposes, we assume that it is. Thus, we reach what the Superior Court regarded as the primary question in the case: May plaintiffs recover damages for "wrongful life"?[5]

## IV

We now focus on plaintiffs' claim that the surgeon should be compelled to assume financial responsibility for raising and educating the child. The Superior Court con-

3. Affidavits filed by defendant Medical Center state that, in accordance with accepted medical standards, the Hospital had no duty to inform the patient of the alternatives and risks involved in the operation. Plaintiffs concede that the Medical Center has met its burden under *Hurtt* and is entitled to summary judgment on the informed consent aspect of the case. Hence, our discussion in this part of the opinion relates only to defendant-surgeon.

4. The surgeon states in his affidavit that he informed Mrs. Coleman of the risks involved in the operation; thus:
  "8. He informed Mrs. Coleman, as he informs all candidates for bilateral tubal ligation, that, although the chances that the operation will be successful are very good, they are not 100 per cent; that in 1 or 2% of the cases, pregnancy will still occur." In her affidavit Mrs. Coleman denies that she was given such information by the surgeon.

5. The Superior Court, apparently relying on the traditional accountability of tort feasors, concluded that plaintiffs may recover damages for any pain and discomfort which Mrs. Coleman had as a result of the pregnancy and the medical expenses thereof, for the cost of the tubal ligation and for loss of consortium sustained by Mr. Coleman. Defendant-surgeon concedes that he may be liable for any such damages which are proved. Hence, there is no issue for decision on this aspect of the Trial Court's ruling.

cluded that such damages may not be recovered in a court of law because they proceed on the premise that the life involved is "wrongful." We have no doubt that its decision was clearly correct both as a legal concept and as a statement of public policy.

■ First, as to the legal concept, it is settled Delaware law that recovery may not be had for damages which are speculative or conjectural. *Laskowski v. Wallis,* Del.Supr., 205 A.2d 825 (1964) ; *Henne v. Balick,* Del.Supr., 146 A.2d 394 (1958).[6] And that applies to any attempt to measure the value of a human life against its costs. A child is born—how can it be said within the ambit of legal predictability that the monetary cost of that life is worth more than its value? We recognize that a few courts, approaching the problem in clinical terms, have applied a "balancing test" which, presumably, permits a jury to say that a life has been weighed and found wanting and thus the parents have been "damaged." See 27 A.L.R.3d *Annot.*: 906 and the discussion of the cases in *Terrell v. Garcia,* Tex.Civ.App., 496 S.W.2d 124 (1973). We respect the efforts of other Courts to provide a remedy under the circumstances but it seems to us that that kind of judgment, if appropriate at all in an American Court of law, might be applied at the end of a life, after it has been lived and when the facts can be identified.[7] But, in our view, any attempt to apply it at birth can only be an exercise in prophecy, an undertaking not within the speciality of our fact-finders.

Second, as to public policy, we agree with the comments by Justice Hansen in a recent decision by the Supreme Court of Wisconsin in *Rieck v. Medical Protective Co. of Fort Wayne, Ind.,* 64 Wis.2d 514, 219 N.W.2d 242 (1974) ; he wrote:

> "To permit the parents to keep their child and shift the entire cost of its upbringing to a physician who failed to determine or inform them of the fact of pregnancy would create a new category of surrogate parent. Every child's smile, every bond of love and affection, every reason for parental pride in a child's achievements, every contribution by the child to the welfare and well-being of the family and parents, is to remain with the mother and father. For the most part, these are intangible benefits, but they are nonetheless real. On the other hand, every financial cost or detriment —what the complaint terms 'hard money damages'—including the cost of food, clothing and education, would be shifted to the physician who allegedly failed to timely diagnose the fact of pregnancy. We hold that such result would be wholly out of proportion of the culpability involved, and that the allowance of recovery would place too unreasonable a burden upon physicians, under the facts and circumstances here alleged.

. . . . . .

It is such retention of benefits—the parents keeping their child, and seeking to transfer only the financial costs of its upbringing to the doctor—that is a relevant factor in evaluating the public policy considerations involved.

---

6. In *Laskowski* Justice Carey quoted with approval the following statement of the law from *Henne*:
   " 'The law does not permit a recovery of damages which is merely speculative or conjectural. As a general rule, it refuses to allow a plaintiff damages relating to the future consequences of a tortious injury unless the proofs establish with reasonable probability the nature and extent of those consequences. There must be some reasonable basis upon which a jury may estimate with a fair degree of certainty the

probable loss which plaintiff will sustain in order to enable it to make an intelligent determination of the extent of this loss.' "

7. At common law there was not an action for "wrongful death" because "public policy . . . decreed that the life of a person could not be made the subject of valuation." *Hazzard v. Alexander,* Del.Super., 173 A. 517 (1934). In Delaware the action was created by statute in 1866 which now appears at 10 *Del.C.* § 3704.

*Gleitman v. Cosgrove,* 49 N.J. 22, 227 A.2d 689 (1967), expresses the same policy. That was an action by a minor born with defects of a mother who had had German measles during pregnancy. The claim was that defendant-physician had failed to advise the mother about possible birth defects and, had she been so informed, she might have aborted the child. The mother sought damages for emotional stress, the father claimed the costs of caring for the child. In denying relief the Supreme Court said:

> "The normal measure of damages in tort actions is compensatory. Damages are measured by comparing the condition plaintiff would have been in, had the defendants not been negligent, with plaintiff's impaired condition as a result of the negligence. The infant plaintiff would have us measure the difference between his life with defects against the utter void of nonexistence, but it is impossible to make such a determination. This Court cannot weigh the value of life with impairments against the nonexistence of life itself. By asserting that he should not have been born, the infant plaintiff makes it logically impossible for a court to measure his alleged damages because of the impossibility of making the comparison required by compensatory remedies.

. . . . . .

We hold that the first count of the complaint on behalf of Jeffrey Gleitman is not actionable because the conduct complained of, even if true, does not give rise to damages cognizable at law.

The mother and father stand in a somewhat different position from the infant. . . . Mrs. Gleitman can say that an abortion would have freed her of the emotional problems caused by the raising of a child with birth defects;

and Mr. Gleitman can assert that it would have been less expensive for him to abort rather than raise the child.

> "A considerable problem is raised by the claim of injury to the parents. In order to determine their compensatory damages a court would have to evaluate the denial to them of the intangible, unmeasurable, and complex human benefits of motherhood and fatherhood and weigh these against the alleged emotional and money injuries. Such a proposed weighing is similar to that which we have found impossible to perform for the infant plaintiff. When the parents say their child should not have been born, they make it impossible for a court to measure their damages in being the mother and father of a defective child.

. . . . . . .

> Though we sympathize with the unfortunate situation in which these parents find themselves, we firmly believe the right of their child to live is greater than and precludes their right not to endure emotional and financial injury. We hold therefore that the second and third counts of the complaint are not actionable because the conduct complained of even if true, does not give rise to damages cognizable at law; and even if such alleged damages were cognizable, a claim for them would be precluded by the countervailing public policy supporting the preciousness of human life." [8]

See also *Stewart v. Long Island College Hospital,* 35 A.D.2d 531, 313 N.Y.S.2d 502 (1970), aff'd, 30 N.Y.2d 695, 332 N.Y.S.2d 640, 283 N.E.2d 616 (1972).

█ In sum, we agree with the Superior Court that the value of a human life outweighs any "damage" which might be said to follow from the fact of birth, and recovery on any such thesis would violate

8. Plaintiff relies on *West v. Underwood,* 132 N.J.L. 325, 40 A.2d 610 (1945), which permitted recovery for a negligently performed sterilization; but that case does not discuss damages for "wrongful life" and, in any event, *Gleitman* is the latest expression on the subject by the New Jersey Supreme Court.

both our public policy and the law governing provable damages.[9]

As indicated above, a few courts have taken what might be regarded as different views from those stated herein and we can only record our disagreement with them.[10] And our conclusions follow those of the great majority of Courts as noted in 27 A. L.R.3d supra:

> "Most courts have decided that the addition of a normal child to the family is a gift of great benefit to the recipients, rather than a cause of damage to them, and that to grant damages for the birth of a human being under these circumstances would, in any event, be against public policy. The reported case [*Custodio v. Bauer* [251 Cal.App.2d 303] 59 Cal.Rptr. 463 (1967)] with its statement that when unwanted, the addition of a normal child to the family can be the cause of compensable injury, is the only explicit exception to this view."

\* \* \* \* \* \*

Other arguments made by plaintiffs are deemed to be without merit.

\* \* \* \* \* \*

In concluding this opinion we want to say a few words about and to the child who is the subject of the lawsuit. And in so doing we follow the thoughtful dictum with which the Wisconsin Court ended its opinion in *Rieck*. The child who is the subject of this legal controversy may one day read what is written here and what has been said about him and his circumstances by lawyers and judges. We say to him, and we emphasize this, that we regard this case, not as one founded on rejection of him as a person, but simply as a sounding for the "outlimits of physician liability" in a malpractice action. *Rieck v. Medical Protective Co. of Fort Wayne, Ind.* supra. That is what the case is about, that is what we have measured.

Affirmed.

---

9. Plaintiffs argue that *Peters v. Gelb* supra determined that Delaware public policy does not preclude payment of the kind of damages here sought, but that question is not considered in either opinion in that case.

10. To our knowledge, no court has awarded damages to the siblings of an unwanted child. Such an action is "without foundation in law or logic." *Aronoff v. Snider*, Fla.App., 292 So.2d 418 (1974).